# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **KIASANTANA LLC**, an Oregon limited liability company; and **KOERNER CAMERA SYSTEMS, INC.**, an Oregon corporation, | Case No. 3:20-cv-1419-SI |
| | **OPINION AND ORDER** |
| Plaintiffs, | |
| v. | |
| **TRI-COUNTY METROPOLITAN TRANSPORTATION DISTRICT OF OREGON**, a municipal corporation of the State of Oregon; and the **CITY OF PORTLAND**, a municipal corporation of the State of Oregon, | |
| Defendants. | |

Cynthia M. Fraser, Paul H. Trinchero, FOSTER GARVEY PC, 121 SW Morrison Street, 11th Floor, Portland, OR 97204. Of Attorneys for Plaintiffs.

Joel A. Mullin, Keilley D. Keating, and Crystal S. Chase, STOEL RIVES LLP, 760 SW Ninth Avenue, Suite 3000, Portland, OR 97205. Of Attorneys for Defendant Tri-County Metropolitan Transportation District of Oregon.

Elizabeth C. Woodard, Deputy City Attorney, OFFICE OF THE CITY ATTORNEY, CITY OF PORTLAND, 1221 SW 4th Avenue, Suite 430, Portland, OR 97204; Mark J. Fucile and Daniel K. Reising, FUCILE & REISING LLP, 2512 SE 25th Avenue, Suite 303, Portland, OR 97202. Of Attorneys for Defendant City of Portland.

**Michael H. Simon, District Judge.**

Plaintiffs Kiasantana, LLC (Kiasantana) and Koerner Camera Systems, Inc. (Koerner) assert claims against two public-entity defendants, Tri-County Metropolitan Transportation District of Oregon (TriMet) and the City of Portland (the City). Plaintiffs' claims concern the construction and operation of a pedestrian and cyclist bridge next to real property owned by Kiasantana and leased and operated by Koerner. Among other things, Plaintiffs allege that Defendants' bridge partially blocks access by commercial trucks to a loading dock on Plaintiffs' property, making it more difficult for Koerner to operate its business. As their first claim, labeled "inverse condemnation," Plaintiffs allege, under 42 U.S.C. § 1983, that Defendants violated Plaintiffs' Fifth Amendment right to receive just compensation for the taking of private property for public use. That is Plaintiffs' only federal claim. Plaintiffs also allege four state law claims, consisting of a similar inverse condemnation claim under the Oregon Constitution, three common law claims, and a claim under an Oregon statute. ECF 1 (Complaint).

TriMet has moved to dismiss Plaintiffs' first and second claims, arguing that Plaintiffs have not adequately alleged that they have a protectable property interest that was appropriated and is compensable under either the Takings Clause of the Fifth Amendment of the United States Constitution or Article I, section 18 of the Oregon Constitution. In the alternative, TriMet argues that Plaintiffs' federal claim should be dismissed because Plaintiffs have not sufficiently alleged facts showing § 1983 municipal liability under *Monell v. Department of Social Services of New York*, 436 U.S. 658, 691 (1978), and that the Court should decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3) for Plaintiffs' remaining state law claims. ECF 13 (TriMet's Motion to Dismiss). TriMet also requests that the Court take judicial notice of certain facts and documents (ECF 15). The City joins TriMet's motion to dismiss, provides additional

arguments under *Monell* specific to the City, and moves to dismiss Plaintiffs' common law and state statutory claims against the City. ECF 16 (the City's Motion to Dismiss). For the following reasons, the Court grants Defendants' motion to dismiss Plaintiffs' federal claim and declines to exercise supplemental jurisdiction over Plaintiffs' state claims.

## STANDARDS

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the Court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epstein Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

## BACKGROUND

Kiasantana owns real property located at 2828 SE 14th Avenue, Portland, Oregon 97202 (the Property). Koerner leases the Property from Kiasantana to operate a camera rental business. Koerner provides camera equipment for professional local and national television and movie productions. After purchasing the Property, Kiasantana added, among other improvements, a loading dock to the westernmost side of the building (immediately adjacent to the railroad tracks). Koerner uses the loading dock in its business.

The Property is accessible only from SE 14th Avenue, which runs north-south directly west of the Property. A railroad easement is immediately south of the Property, and other private properties are located north and west of the Property. The Property is zoned for "light industrial use." A parking lot sits immediately between SE 14th Avenue and the front of the building located on the Property. That parking lot has four marked spaces, including one that is compliant with the Americans with Disabilities Act. The image below, attached to Plaintiffs' Complaint as Exhibit C, p. 16, shows a rendering of the Property's location and how, before Defendants' construction, a commercial truck could have accessed the Property by backing up to the loading dock door.



The City and TriMet entered into an Intergovernmental Agreement (IGA) for construction of the Portland-Milwaukie Light Rail (Light Rail). Under the IGA, TriMet has the authority to manage all phases of the construction, design, and acquisitions of property for the Light Rail. The City allows TriMet to use City rights-of-way and property for purposes of the Light Rail. As part of the IGA, the City and TriMet planned for the construction of the Gideon Overcrossing (the Project). The Gideon Overcrossing is an elevated bridge for pedestrians and cyclists near the Light Rail station at SE Clinton Street and SE 12th Avenue that travels above and over the railroad tracks to SE 14th Avenue. The SE 14th Avenue portion of the Gideon Overcrossing was constructed directly in front of the Property. The Parties agree that the image

below, taken from a Google Maps satellite image of the Property on June 10, 2021, fairly depicts the Gideon Overcrossing and the Property today.



In 2018, before beginning construction on the Project, Defendants shared a partially completed construction plan with Plaintiffs. The parties met many times in 2018 and 2019 to discuss the Project. TriMet conducted an "auto-turn analysis" to determine the effect on access to the Property and found that, upon completion of the Project, the loading dock would not be usable in its current position. This analysis also concluded that the loading dock would need to be extended from its current position to remain usable as a loading dock. The image below, attached to Plaintiffs' Complaint as Exhibit C, p. 17, shows a rendering of how the loading dock

could be extended with a "Loading Ramp Extension" to permit continued access by commercial trucks after completion of the Project.



Before construction, TriMet offered to pay Kiasantana for a temporary easement during construction so that TriMet could use the parking lot area on the Property while constructing the Project. Kiasantana, however, declined to grant TriMet a temporary easement. After learning of Kiasantana's position, TriMet did not try to obtain a temporary easement through condemnation procedures.

Construction on the Project began on June 7, 2019, immediately causing limitations on access to the property. Plaintiffs allege that reduced access began on June 7, 2019 and lasted through the duration of the construction of the Project. Plaintiffs also allege that on five days

there was complete vehicular blockage. According to Plaintiffs, on June 11, 2019, a TriMet fence effectively restricteded access to the Property by Koerner's customers and employees. Complaint ¶ 31 (ECF 1). The following month, Project construction allegedly blocked vehicular street access on July 12th and 15th. *Id.* ¶ 32. On August 8th, Project construction allegedly blocked vehicular street access. *Id.* ¶ 33. Finally, on August 17th, a TriMet fence erected around the Project allegedly left only a narrow opening along the frontage of the street, blocking vehiclular access to the Property. *Id.* ¶ 34. Plaintiffs also allege that on May 18th and June 11th, workers and construction equipment temporarily entered, and thereby trespassed on, the Property for an unspecified amount of time. *Id.* ¶ 29 (also noting that on June 11th, TriMet allegedly erected a fence *on the Property*).

The Project has made the loading dock, in its current position, virtually inaccessible to commercial trucks. To enter the Property and get close to the loading dock (but without the ability fully to back into it), a commercial truck would block all parking stalls and all maneuvering area. Plaintiff alleges that the Project's adverse effect on accessibility to the Property has diminished the Property's value by about $500,000 and altered the Property's "highest and best use." *Id.* ¶¶ 39-40.

## DISCUSSION

### A. TriMet's Motion for Judicial Notice

TriMet asks the Court to take judicial notice of one fact and the existence of two documents. The fact is that the Gideon Overcrossing opened for public use on November 10, 2020. The two documents are the Warranty Deed to the Property (ECF 15-1) and Chapter 2 of the TriMet Code (ECF 15-2). Plaintiffs oppose TriMet's request. At oral argument, the Parties presented their respective positions on these issues, and the Court granted TriMet's Motion for Judicial Notice. Thus, the Court takes judicial notice of the fact that the Gideon Overcrossing

opened on November 10, 2020, and of the existence of the two documents, ECF 15-1 and 15-2. These items, however, merely provide background information. They are not legally necessary for the Court's disposition of the pending motions to dismiss.

## B. Defendants' Motions to Dismiss

Defendants move to dismiss all claims. TriMet seeks to dismiss Plaintiffs' federal and state constitutional inverse condemnation claims (respectively, claims one and two) for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. TriMet also argues in the alternative that claim one, Plaintiffs' § 1983 claim for inverse condemnation in violation of the Fifth Amendment, fails to allege a municipal policy or custom sufficient to satisfy the causation requirement under *Monell*. Because claim one is the only cause of action conferring federal question jurisdiction upon this Court, TriMet argues that if the Court dismisses Plaintiffs' first claim the Court should then decline supplemental jurisdiction on the balance of Plaintiffs' claims under 28 U.S.C. 1367(c)(3).[1] Defendants also argue that, if supplemental jurisdiction is not declined, the Court should dismiss Plaintiffs' state law claims for failure to state a claim.

### 1. Plaintiffs' Permanent Takings Claim

In their written submissions, Plaintiffs and Defendants appear to agree that the Court should evaluate Plaintiffs' federal and state constitutional inverse condemnation claims by referring mostly to Oregon law interpreting the Oregon Constitution. Although there may be some differences in what constitutes a taking under the two constitutions, as a threshold matter "the existence of a valid property interest is necessary in all takings claims," under both the U.S.

---

[1] A federal court may decline to exercise supplemental jurisdiction over state law claims and generally should do so when federal law claims conferring original jurisdiction have been eliminated early in the lawsuit. *See Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997).

Constitution and the Oregon Constitution. *See Wyatt v. United States*, 271 F.3d 1090, 1097 (Fed. Cir. 2001); *see also Hansen v. United States*, 65 Fed. Cl. 76, 99-100 (2005) (explaining the "two-step takings inquiry" in which a court must first determine "whether the claimant possessed a stick in the bundle of property rights" and then ask "whether the governmental action at issue constituted a taking of that stick") (quoting *Adams v. United States*, 391 F.3d 1212, 1298 (Fed. Cir. 2004); *State ex rel. Dep't of Transp. v. Alderwoods (Or.), Inc.*, 358 Or. 501, 509 (2015) (holding that a court must first determine whether a plaintiff has a property right at all before determining whether interference with the alleged right was a taking under the Oregon Constitution).

Both the Fifth Amendment to the U.S. Constitution and the Oregon Constitution only protect existing property rights—they do not create new ones. *See Phillips v. Washington Legal Found.*, 524 U.S. 156, 164 (1998) (Fifth Amendment); *accord Alderwoods*, 358 Or. at 509 (citing *Phillips* for the same proposition under the Oregon Constitution). "The existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law." *Phillips*, 524 U.S. at 164 (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *see also Murr v. Wisconsin* 137 S. Ct. 933, 1944-45 (2017).

Plaintiffs argue that they have an existing property right under Oregon common law to continuing vehicular access to the *entire* street frontage abutting their property, precisely as it was at the time of Plaintiffs' purchase of the Property. According to Plaintiffs, this property right is the subject of their takings claim. The Court looks to Oregon state law to determine whether Plaintiffs have such a property right.

In *Alderwoods*, 358 Or. at 510-17, the Oregon Supreme provided an instructive discussion of what rights of access a property owner has in relation to any public roads next to

that owner's property. After discussing more than a century of case law on the subject, the

Oregon Supreme Court explained:

> The above cases demonstrate three governing principles regarding the common-law right of access of a property owner to an abutting public road. First, it is well established that a common-law right of access by property owners attaches to property as an interest in land. Specifically, an abutting property owner holds an easement of access, appurtenant to the abutting land, for the limited purpose of providing a means of ingress and egress to and from the owner's property by means of the abutting public road. Second, the right of access to an abutting road is limited in scope. An abutting property owner does not have an absolute right to access an abutting road at the most direct or convenient location. Rather, the owner has a qualified right that is subject to the government's interest in regulating the safe use of public thoroughfares. Third, the owner's right of access ensures only reasonable access to and from the owner's property by means of the abutting road. Those three principles, in combination, reduce to this central proposition: *When governmental action interferes with an abutting landowner's right of access for the purpose of ensuring the safe use of a public road, and the abutting landowner retains reasonable access to its property, no compensable taking of the property owner's right of access occurs.*

*Id.* at 517 (emphasis added).

Thus, a property owner in Oregon has no reasonable expectation or valid property interest

in an unchanging form of access to the owner's property, provided that "reasonable access"

remains. *See also Eastman v. Anderson*, 2009 WL 1653111, at *8 (D. Or. June 10, 2009) ("In

Oregon . . . [i]nconvenience and reduction in profits which might be suffered by a property

owner is not compensable even if lawful regulatory action by the State interferes with an

abutting property owner's access to a highway from the property. Where access to private

property is retained through another public road, even though that access may be less

satisfactory, the loss of direct highway access is not compensable.") (simplified). This means that

a property owner has a right only to "reasonable access" to the owner's property by public roads

and does not have a permanent right to unchanging access.

Whether the remaining access is reasonable may be decided by a judge as a matter of law, especially when "historical facts" are undisputed. *See Alderwoods*, 358 Or. at 518-19; *see also id*. at 520 ("We save for another day the question of whether the reasonableness of remaining access could present a factual question under circumstances not present in this case, such as when reasonable minds could disagree about whether a property owner retains an adequate means of ingress and egress.").

Here, the Court finds that whether Plaintiffs continue to have reasonable or adequate means of access is appropriate for the Court's resolution because, accepting Plaintiffs' factual allegations as true,[2] Plaintiffs have not plausibly alleged that their remaining access to the Property is "unreasonable" under *Alderwoods* and its progeny. In *Alderwoods*, the Oregon Supreme Court held that when two driveways that previously allowed direct vehicular access to the highway from the defendant's property were removed but the property still retained access to the highway through two driveways from a city street that ran perpendicular to and intersected the highway, adequate means of accessing the highway continued. *Id.* at 503.

A fair reading of Plaintiffs' Complaint reveals that Plaintiffs retain at least as much access to the road as did the property owners in *Alderwoods*. Plaintiffs do not plausibly allege that they do not have adequate means of ingress and egress or access to SE 14th Avenue. Nor do they allege that commercial trucks cannot access the Property at all or that the Property is otherwise inaccessible to vehicles. Instead, they allege only that it has become more inconvenient for commercial trucks to load and unload because the Gideon Overcrossing now

---

[2] *Alderwood* says that a court may determine that a plaintiff has reasonable access when "historical facts" are undisputed. 358 Or. at 518-19. At the motion to dismiss stage, historical facts are not in dispute because the Court must assume that a plaintiff's well-pleaded factual allegations are true. *See Daniels-Hall*, 629 F.3d at 998.

blocks direct access to the loading dock as it is currently constructed. Inconvenient access, however, is not necessarily unreasonable access. *See Eastman*, 2009 WL 1653111 at *8. Thus, no property interest recognized under Oregon law is affected by Defendants' actions, and a federal constitutional claim may not proceed. The Court dismisses Plaintiffs' takings claim under the Fifth Amendment based on the permanent installation of the Gideon Overcrossing.[3]

_____

[3] Even if Plaintiffs had adequately alleged that they were deprived of a property interest, their federal takings claim (or inverse condemnation claim) does not involve a "regulatory taking" in the traditional sense. The quintessential regulatory taking involves a regulation that creates a new legal restraint that directly controls how a property owner may use the owner's property. Examples include: (a) zoning ordinances, *see Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387-388 (1926); (b) governmental orders barring the mining of gold, *see United States v. Central Eureka Mining Co.*, 357 U.S. 155, 168 (1958); and (c) regulations prohibiting the sale of eagle feathers, *see Andrus v. Allard*, 444 U.S. 51, 65-66 (1979); *see generally* Erwin Chemerinsky, *Constitutional Law: Principles and Policies* (6th ed. 2019) § 8.4.2.2 (explaining that a regulatory taking exists "if the government denies all economically viable use of property in a manner that interferes with reasonable expectations for use" and that regulatory takings typically involve zoning ordinances, conditions on development of property, limits on conveyance of property, rent and rate controls, and imposition of government liability) (emphasis added).

Here, Plaintiffs allege that the government built a structure on publicly owned land adjacent to Plaintiff's Property that has the indirect effect of changing how Plaintiffs can use their Property. The United States Supreme Court has explained that when identifying an inverse condemnation claim "[th]e essential question is not . . . whether the government action at issue comes garbed as a regulation (or statute, or ordinance, or miscellaneous decree). It is whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." *Cedar Point*, 141 S. Ct. at 2072, (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321-23 (2002)) (emphasis added).

Plaintiffs have called the Court's attention to a district court decision in which the plaintiff argued, and the district court agreed, that a governmental subway construction project that blocked access to a business amounted to a "regulatory taking" under the *Penn Central* framework. *See Mekuria v. Washington Metro. Area Transit Auth.*, 975 F. Supp. 1 (D. D.C. 1997). In response, Defendants identified a Washington (State) Court of Appeals decision that criticized the district court's analysis in *Mekuria. See Tapio Inv. Co. I v. State ex rel. Dep't of Transp.*, 196 Wash. App. 528, 545-46 (2016). In *Tapio*, the Washington Court of Appeals stated that "*Mekuria* is a legal anomaly in its willingness to entertain a *Penn Central* regulatory taking claim where there was no regulation." *Tapio*, 196 Wash. App. at 546. Because the Court here finds that Plaintiffs have not shown that they have a property right recognized under Oregon law, the Court need not reach the issue of whether Plaintiffs' claim may be brought as a regulatory

As noted, Plaintiffs have no property interest recognized by Oregon law in continuing to use their frontage exactly as it had been used when Plaintiffs bought or leased the Property. Plaintiffs also have no property interest recognized by Oregon law in using the loading dock in the exact manner that it was constructed by Plaintiffs to be used. Thus, the Court dismisses Plaintiffs' takings claim under the Fifth Amendment based on the permanent installation of the Gideon Overcrossing.

### 2. Plaintiffs' Temporary Takings Claim

In addition to a permanent taking claims, Plaintiffs also allege a temporary taking. Plaintiffs' divide their temporary takings claim into two alternative claims. First, Plaintiffs allege that on a handful of occasions during construction, workers would occasionally trespass on the Property, either by walking on the Property or by temporarily placing equipment on the Property. Second, Plaintiffs contend that on five separate days, Defendants' construction activities effectively denied Plaintiffs, their customers, and their suppliers from having any access to the Property.

Regarding the first form of alleged temporary taking, a handful of instances of trespass by construction workers on foot or by construction equipment passing over the Property's parking lot, although potentially tortious as a trespass, are not takings that rise to a constitutional level. *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2078 (2021) ("Isolated physical

---

takings claim in the absence of a law or other regulation that restricts by operation of law Plaintiffs' use of their Property, as was the case in *Mekuria*.

Moreover, there appears to be other features in *Mekuria* that make that decision factually distinguishable from the pending case. To provide just one example, in *Mekuria* the plaintiffs alleged that the defendant had "deprived them of their right to reasonable access to their properties and thus eliminated *all* viable economically beneficial or productive uses of their properties." *Mekuria*, 975 F. Supp. at 3 (emphasis added). Plaintiffs here do not allege that Defendants' deprived them of *all* economically beneficial use of their property.

invasions, not undertaken pursuant to a granted right of access, are properly assessed as individual torts rather than appropriations of a property right.").

Regarding the second form of alleged temporary taking, the Court will assume without deciding that five isolated instances of *complete* vehicular (and sometimes even customer and employee) blockage during five days might be enough to rise to the level of a temporary taking. For the reasons explained below, however, Plaintiffs have not alleged a policy or custom authorizing such temporary blockages sufficient to show *Monell* liability against either TriMet or the City.

Section 1983 provides a cause of action against any "person" who, under color of law, deprives any other person of rights, privileges, or immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; *see Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 984 (9th Cir. 2002) (the term "person" in § 1983 includes municipalities). A local government, however, such as the City or TriMet, cannot "be held liable under § 1983 on a *respondeat superior* theory" of liability. *See Monell*, 436 U.S. at 691. "Liability may attach to a municipality only where the municipality itself causes the constitutional violation through 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Ulrich*, 308 F.3d at 984 (quoting *Monell*, 436 U.S. at 694). Besides actions taken under official policies, *Monell* liability may attach when the policymaking authority delegates *policymaking authority* to or ratifies the actions of a subordinate, *id.*, or when the municipality's policy or custom was the "moving force" behind the violation, *Dougherty v. City of Covina*, 654 F.3d 893, 900 (9th Cir. 2011). Further, when a plaintiff asserts a claim under § 1983 based on allegations of a local government's "failure to act," that plaintiff "must allege that the municipality exhibited deliberate indifference to the violation of [that plaintiff's]

federally protected rights." *Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1142 (9th Cir. 2020).

Plaintiffs have alleged no policy or custom that caused Defendants to be liable for a temporary taking created by the complete blockage of all vehicular access five times during the construction of the Project. Instead, Plaintiffs' allegations of Defendants' "policies and customs" are merely conclusory assertions. For example, Plaintiffs allege:

> The violation of plaintiffs' constitutional right to just compensation for the taking of real property interests for a public use or purpose were caused by TriMet in the following manner:
>
> a.      In having a policy and /or custom and practice of allowing a temporary taking of private property rights for public use without paying just compensation where the project is to be constructed in an abutting public right of way;
>
> b.      In having a policy and/or custom and practice of a permanent taking of reasonable access for a public purpose without paying just compensation where the project is to be constructed in an abutting public right of way;
>
> c.      In having a policy and/or custom and practice of a [*sic*] taking a property owner's right to use a platted street for vehicular traffic for a public purpose without paying just compensation where the project is to be constructed in the public right of way;
>
> d.      In having a policy and/or custom and practice of temporary taking of property rights for a public use without paying just compensation as part of project despite knowledge of repeated instances when public employees and contractors have entered onto and used private property without property owner's consent for purposes of constructing a public works project;
>
> e.      In having a policy and/or custom of finding that no taking of property rights have occurred where the public works project is constructed in a public right of way regardless of the impact on abutting property owners;
>
> f.      In failing to train and instruct its employees and agents in how to construct a public works project without using

and entering private property without necessary consent from the owner or leaseholder;

> g.     In failing to train and instruct its employees and agents in how to design a public works project without depriving reasonable access to the abutting private property;

> h.     In having a policy and/or custom of ratifying and approving temporary and permanent taking of property rights for a public purpose without paying just compensation as described in subparagraphs a through g above; and

> i.     By the respective actions of policy makers Lance Erz, Shelley Devine, Ken McGair and Tracey Reeves in approving and/or ratifying temporary and permanent taking of property rights for a public purpose without paying just compensation as described in subparagraphs a through g above.

ECF 1 ¶ 54. These are merely legal conclusions, however, and lack necessary factual specificity.

Because isolated and temporary intermittent trespasses do not rise to the level of a § 1983 claim and because Plaintiffs have not, other than in a conclusory fashion, alleged any municipal policy that caused complete, even if temporary, blockage of all access to the Property, the Court dismisses Plaintiffs' temporary federal takings claim.

### 3. Plaintiffs' State Law Claims

A district court may exercise supplemental jurisdiction over state law claims when it has original jurisdiction over related claims. *See* 28 U.S.C. § 1367(a). Defendants argue that the Court should decline to retain supplemental jurisdiction over Plaintiffs' state law claims if the Court dismisses Plaintiffs' federal constitutional claim. The Court agrees. When a lawsuit is in an early stage of litigation, as is the case here, after "all federal law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). In addition, if the Court has misunderstood Oregon's common law of real property (or if

the Court has correctly understood that law but Plaintiffs seek an opportunity to ask the Oregon

Supreme Court to modify that law), Plaintiffs will have a better chance of presenting their

arguments to the Oregon Supreme Court if this district court declines supplemental jurisdiction.

Thus, the Court declines to exercise supplemental jurisdiction and dismisses Plaintiffs'

remaining state law claims.

## CONCLUSION

The Court GRANTS TriMet's request for judicial notice (ECF 15). The Court also

GRANTS the motions to dismiss filed by TriMet (ECF 13) and the City (ECF 16), dismisses

Plaintiffs' federal constitutional claim, and declines to exercise supplemental jurisdiction over

the remainder of Plaintiffs' state law claims under 28 U.S.C. § 1367(c)(3). If Plaintiffs believe

that they can cure the deficiencies identified in this Opinion and Order, Plaintiffs may file an

amended complaint within 14 days.

**IT IS SO ORDERED**.

DATED this 9th day of July, 2021.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge